37 183
51 539

JAMES W. THOMAS v. TIMOTHY B. SWEET, *et al.*

1. CORPORATION — *Obligations of Officers.* When the offices of vice president and treasurer of a corporation are vested in one person, and at the same time he is the managing and controlling officer of the company, his relations to the creditors and stockholders are of such a character that the utmost good faith towards their interests, and the most scrupulous attention to the affairs of the corporation, are imperatively demanded of him.

2. ———— *Liability.* The law does not permit such a person to so manage the affairs of the corporation as to result to his own pecu-

niary advantage;'and if he speculates with the funds of the company, or buys claims against it at a discount, he must account to its creditors or stockholders for any profit that results from such dealings.

### Error from Shawnee District Court.

THE opinion states the nature of the action, and the material facts. The defendant, *Timothy B. Sweet,* demurred to the petition. July 24, 1884, the court sustained the demurrer. This ruling the plaintiff, *James W. Thomas,* brings here for review.

*F. G. Hentig,* and *G. C. Clemens,* for plaintiff in error.

*W. P. Douthitt,* and *Rossington, Smith & Dallas,* for defendants in error.

Opinion by SIMPSON, C.: The questions in this case arise on the defendant's (Sweet's) demurrer to the petition, which the court below sustained. The plaintiff, assigning this ruling as error, brings the case here.

The material statements in the petition are as follows:

FIRST—*The Plaintiff's Demands:* (1) That he is an unsatisfied *bona fide* creditor of the Topeka Rolling-Mill Company, who sues for himself and all other *bona fide* unsatisfied creditors of said company; (2) that on the 12th day of May, 1874, the said company made its promissory note to the plaintiff for the sum of $5,000, with interest at 12 per cent. per annum from date (said note maturing in eight months), in consideration of so much money advanced by him for the company; that on the 24th day of September following, the company executed a mortgage to secure this note on the real estate and mills of said company; (3) that on the 11th day of December, 1874, he recovered against said company judgments before a justice of the peace, aggregating $852.85, and $31.50 costs; (4) that on the 30th day of December, 1874, judgments were recovered against the company in his favor, amounting to $171.10; and that proper abstracts of these judgments were duly filed in the office of the clerk of the district court of

Shawnee county; (5) that on the 22d day of August, 1874, for the accommodation of said company and its surety, the defendant, Timothy B. Sweet, he indorsed the promissory note of said company of that date for $1,000, due thirty days after date, with interest at 12 per cent. per annum; that said note was discounted at the bank of Black & Sons, in the city of Topeka, and said company having failed to pay the same when it became due and payable, he was compelled to pay it, and did pay it; that, to indemnify him as indorser on said note, the company delivered to him one of its first-mortgage bonds for $1,000, dated January 1, 1874, payable five years after date, with semi-annual interest according to coupons attached, which said bond was taken by plaintiff in good faith, and without knowledge or notice of any of the transactions connected with said bonds, as hereinafter set forth; (6) that the plaintiff has at all times remained and is now the owner and holder of all said indebtedness, and has never been paid any part thereof, nor of the interest thereon.

SECOND — *The Rolling-Mill Company*: (1) That said Topeka Rolling-Mill Company is a corporation, and was duly incorporated under the laws of the state of Kansas, on the 31st day of December, 1873, for the purpose of rolling and manufacturing railroad and merchants' iron, and carrying on the general business of manufacturing iron castings, etc., at Topeka, Kansas; (2) that at its original organization, Timothy B. Sweet, Reuben D. Coldren and E. L. Derby became, and have ever since continued to be, the board of directors of said company; that Timothy B. Sweet became, and has continued to be, vice president and treasurer thereof, Reuben D. Coldren its president, and E. L. Derby its secretary — no election for directors or officers ever having been called or held since its original organization, and the said Timothy B. Sweet has during all this time been its chief and controlling officer; (3) that, immediately upon the organization of said company, it purchased from the Topeka Iron and Steel Company a tract of real estate in the city of Topeka, upon which rolling-mills had been partially erected, and it at once com-

pleted said mills, and on the 15th day of April, 1874, they were fully provided with machinery, tools, implements, and fixtures, and were ready for operation; (4) that said mills were operated by said company until the 31st day of December, 1874, at which time they were placed in charge and under the control of a receiver of the Shawnee county district court, as hereinafter stated, and from the operation of said mills large profits were derived, which were retained and converted to his own use and benefit by the said Timothy B. Sweet, and applied by him to the payment of certain pretended indebtedness of said company to him.

THIRD — *The First-Mortgage Bonds:* (1) That immediately after the organization of the Topeka Rolling-Mill Company, it issued and sold to the Shawnee County Bank its first-mortgage bonds to the amount of $60,000 in bonds of $1,000 each, dated the 1st day of January, 1874, payable five years after date, with semi-annual interest coupons attached, secured by a first mortgage on the real estate and mills of the company; (2) that said bank was to pay $58,000 therefor, in payments as follows: $10,000 cash at date; $10,000 February 1st, 1874; $10,000 March 1st; and $8,000 April 1st, 1874, in cash; the remaining $20,000 thereof to be paid in paid-up stock of the Topeka Iron and Steel Company, from which the Topeka Rolling-Mill Company had purchased its real estate and a partially completed mill; (3) that said bonds were to be placed in escrow in the hands of George F. Parmelee, who was the cashier of the Shawnee County Bank, and were to be delivered by him to said bank as fast as they were paid for; (4) that the bonds were issued and delivered in escrow, and said mortgage was made and recorded; that the bank paid the first $10,000 payment and about $600 additional, and then refused to further perform its contract of purchase, and thereupon eleven of said bonds were delivered to said bank in full satisfaction of the $10,000 it had paid; (5) that twenty-nine of said bonds were surrendered to Sweet, Coldren and Derby for said company; (6) that Arthur C. Huidekoper was the president of the Shawnee County Bank during this time, and he wrongfully obtained

possession of the remaining twenty of said bonds, and with them and the eleven bonds delivered to the bank, left the state of Kansas, and has never returned; (7) that all these things occurred with the knowledge of Timothy B. Sweet, who made no effort to prevent them; (8) that of the twenty-nine bonds returned to said company, one was delivered to the plaintiff as heretofore stated; (9) that by an agreement made by and between Sweet, Coldren and Derby with intent to cheat, wrong and defraud the *bona fide* creditors of said company, thirteen of said bonds were delivered to Coldren to be held by him as security for certain obligations and indebtedness of said company to him; (10) that the remaining fifteen of said bonds were taken possession of by E. L. Derby, who fled from the state with them, and has never returned; (11) that all these things were done with the knowledge of Sweet, who made no effort to prevent them.

FOURTH — *The Second Mortgage:* (1) That on the 25th day of September, 1874, the Topeka Rolling-Mill Company executed to Timothy B. Sweet a second mortgage on all of its real estate and mills to secure payment to Sweet of a large sum of money claimed to be due Sweet from the company, and to secure him as surety and indorser for the company, and that this mortgage was recorded the same day it was executed; (2) that on the 19th day of October, 1874, Sweet and Coldren entered into a written agreement, by the terms of which the thirteen mortgage bonds were to be turned over to Sweet, and Sweet assigned to Coldren an interest in said mortgage, and the proceeds of the mills were first to be applied to the reduction of the indebtedness of the company to Sweet, until the amount should be reduced to a sum equal to that of the indebtedness of the company to Coldren, and then Coldren and Sweet should hold the mortgage equally.

FIFTH — *The Huidekoper Suit:* (1) That on the 21st day of December, 1874, Arthur C. Huidekoper, claiming to be rightful owner and holder of said thirty-one bonds, commenced his action in the Shawnee county district court against the company, Sweet and others, alleging the insolvency of the

company; that Sweet, Coldren, and Derby had fraudulently obtained possession of said twenty-nine bonds, praying a judgment for the amount of his bonds with interest, and asking the appointment of a receiver, and an injunction against Sweet, Coldren, and Derby, to prevent them from disposing of the twenty-nine bonds, or withdrawing them from the jurisdiction of the court, and for a foreclosure of a first mortgage given to secure said first-mortgage bonds; (2) that Sweet, well knowing that but eleven of said bonds had ever been rightfully issued, and there being then in his hands rightfully belonging to said company, and derived from the profits of its business, sufficient funds to pay off all then due on said bonds, and well knowing that the coupons on the said eleven bonds were overdue, because he had misappropriated the funds of said company, which should have been applied to their payment, colluded with said Coldren and the said Huidekoper for the purpose of procuring a fraudulent judicial sale and disposition of said real estate and mills; (3) that on the 31st day of December, 1874, without any showing therefor required of said Huidekoper, and said showing being impossible if required, Sweet consented in open court, on behalf of said company, to the appointment of a receiver for said real estate and mills, as prayed for by said Huidekoper, and said receiver was thereupon appointed by the court, and on that day took possession of said real estate and mills, and all the assets of said company; (4) that Sweet answered to said action as a defendant therein, without controverting the right of Huidekoper to recover in any manner whatever, but set up a large indebtedness of said company to him, and liability incurred for said company, aggregating the sum of $27,433.77, all of which was covered and secured by said mortgage executed to him on the 23d day of September, 1874, which was also set up in said answer; and said Sweet prayed judgment for said sum, and foreclosure of said mortgage, and a sale of the real estate and mills to satisfy his judgment; (5) that at the same time the said Sweet caused an answer to be filed in said action by A. H. Hentig, A. W. Strong, and the Citizens' Bank,

each setting up a portion of the first thirteen mortgage bonds, so as aforesaid wrongfully taken by said Coldren, and obtained from him by said Sweet, to wit, bonds Nos. 32, 33, 34, 35, and 36, were set up in the pretended answer of the said A. H. Hentig as owner and holder; that bonds Nos. 37, 38, 39, 40, 41, and 42, were set up in the pretended answer of the Citizens' Bank; that bonds Nos. 43 and 44 were set up in the pretended answer of A. W. Strong — the said bonds and coupons being then and there all the time in the possession and under the control of the said Sweet, under his arrangement with said Coldren, and neither Hentig, Strong, nor the Citizens' Bank having ever had any interest in the same; but said answers were prepared and filed without the knowledge, consent, or authority of either said Strong, Hentig, or the Citizens' Bank, but by the sole procurement and direction of said Sweet, for the purpose of having it appear to the court, and the adverse parties in said action, that said bonds had been negotiated and were held by innocent holders, to the end that he might more easily obtain judgment thereon against said company, and share in the proceeds of the sale of the said real estate and mills to a greater extent; (6) that all but a small portion of the pretended indebtedness set up by said Sweet in his answers as due him from said company, was wholly fictitious and without consideration, and all the pretended promissory notes alleged in said answer to have been given by said company, were made and delivered without authority therefor, were not the obligations of said company, and most of them did not purport to be the obligations of said company; (7) that all of said pretended indebtedness was made and incurred during the time the said Sweet, Coldren and Derby were operating said mills for their own exclusive use and profit, and while they were in exclusive receipt of all revenues and income of said company, and were appropriating the same to their own exclusive use and benefit as hereinbefore alleged; and any money actually advanced by said Sweet procured on said indorsements, was so advanced and procured to pay the current running expenses of said mills while so operated, in-

cluding large salaries to the said Sweet, Coldren, and Derby, and for the private use of Sweet, Coldren and Derby while operating said mills for their own benefit, and none of said money was received by or went to the benefit of said company, and the profits secured by Sweet exceeded all of said pretended indebtedness by many thousands of dollars; (8) that at the time said answer was filed by said Sweet, the said company did not owe him a single dollar, but that he was indebted to said company in a large sum for the receipt and use of the income and revenue of said mills, all of which the said Sweet well knew; (9) that, before the filing of said answers, the Birmingham iron foundry, a defendant in said action, had filed its answer setting forth the frauds of Huidekoper, Sweet, Coldren and Derby in obtaining among them forty-nine of said first-mortgage bonds, as heretofore stated, praying the cancellation of said illegal bonds, and setting up on its own account a pretended mechanics' lien on said real estate and mills, to the amount of $32,317.47 with interest, and $2,000 attorney-fees for foreclosing said lien, which said lien so set up was constituted solely by two certain writings, (attached and marked as exhibits C and D;) (10) that said pretended lien was wholly invalid upon its face, as the said Sweet well knew, and the said Birmingham iron foundry had no claim whatever in law or equity against said company or its property; (11) that said Sweet caused an answer to be filed by said rolling-mill company, which was filed on the same day as the answers of Sweet, Hentig, Strong and the Citizens' Bank, and they were all prepared by the same attorney, and all by the directions and retainers of said Sweet, and from data and information supplied by him for the purpose, and he well knew the contents of said answer, as well as the answers of the said Birmingham iron foundry; and, regardless of his duty in the premises to the *bona fide* creditors of the company, he caused the answer of the rolling-mill company to omit all notice of said Coldren bonds, said indebtedness set up by the said Sweet, and the pretended demand and lien of the said Birmingham iron foundry, and utterly and purposely neglected to make

any defense whatever for or by said rolling-mill company against said claims or either of them, although he took sole management and charge, as vice president, of the litigation for said company — the president of said company having left the state of Kansas, and being then in the state of California; (12) that the claim of the Birmingham iron foundry was solely on the mechanics' lien as aforesaid; the indebtedness by said foundry alleged, if any there was, being the personal indebtedness of Derby & Coldren, a partnership consisting of Reuben D. Coldren and E. L. Derby, and not the indebtedness of said company; and Coldren & Derby had long before been paid by said company for the identical items set up by said foundry, and the whole of said demand; and the said Coldren & Derby, and the said Reuben D. Coldren and E. L. Derby, were each of them indebted then to the said rolling-mill company for large amounts, in excess of said demand as contractors, and all other demands held or claimed by them or either of them against said company; all of which the said Timothy B. Sweet, when said answer was filed by said iron foundry, well knew, and had long known, and knew that equitably and justly said company should not pay any portion of said alleged indebtedness.

SIXTH — *A Secret Agreement:* (1) That while said action was pending, to wit, in the month of July, 1875, the said Huidekoper and said Sweet met and mutually agreed not to controvert each other's claims set up in said action, but to act together for their mutual benefit secretly, while pretending to controvert each other's claims, and keep up the semblance in said action of adversary proceedings between them, and mutually labor to defeat all other claims set up or to be set up in said action; (2) that thereupon the said Sweet bought up divers judgments against said company at sums greatly less than the amounts due thereon, and in his answer set them up at their full value against the company, instead of giving said company the benefit of the discounts thereon obtained by him; he, the said Sweet, having then in his hands, as treasurer as aforesaid,

funds enough of said company to have fully paid off each and every of said judgments.

SEVENTH — *A Second Secret Agreement:* (1) That on the 30th day of August, 1876, the said Huidekoper, Royal M. Bassett, for the Birmingham iron foundry, and said Sweet, entered into an agreement in writing, by which they agreed with each other not to contest each other's claims, but to have judgment obtained upon them as soon as possible, and that each one of them should share equally in whatever decree might be rendered in favor of either of them in said action; and, if they should succeed in buying in said mills and real estate at the sale under such decree, each therein should own in his own right one-third interest therein, (a copy of the agreement is attached and made a part of the petition;) (2) that, in pursuance of said agreement, each of said parties instructed his attorneys to act secretly in concert with the attorneys of each of the other parties, while remaining apparently adverse, so that such agreement might not be known to, or suspected by, the plaintiff, or any other of the *bona fide* creditors who were defendants in said action; and in pursuance thereof, said action was thereafter, on the 21st day of September, 1876, brought to trial, and was tried by the attorneys of said parties as if the said Sweet, Huidekoper, and the Birmingham iron foundry were hostile to each other, by which means said plaintiff was deceived, as were also all the other *bona fide* creditors who were defendants in said action, and believed that an honest trial and contest was being carried on by the parties apparently the most interested therein; (3) that said agreement was by said Sweet and the other parties thereto fully understood to include the agreement on the part of Sweet that no defense should be made by or for the said rolling-mill company against the said claims of Sweet, Huidekoper, or the Birmingham iron foundry, and that no obstacle should by or for said company be thrown in the way of the consummation of said agreement.

EIGHTH — *The Plaintiff in Error a Party Defendant:* (1) That

the plaintiff was made a party defendant to said claims and
filed his answer therein, setting up his claims hereinbefore
set forth, but said plaintiff knew nothing whatever, nor had
he any notice or suspicion at that time, nor until long after-
ward, of the existence of any of the doings of fraudulent acts
and schemes hereinbefore alleged on the part of or by the said
Sweet, or by him and Coldren and Derby, or either of them,
or by said Sweet, Huidekoper, and the Birmingham iron foun-
dry; nor had he any means at that time, or until recently, of
ascertaining anything concerning said doings, schemes, acts
and agreements, but filed his answer in said action in the
utmost good faith on his part, supposing and believing said
action to be an honest adversary proceeding on the part of the
said Huidekoper, the Birmingham iron foundry, said Sweet,
and the rolling-mill company, and supposing and believing
that a due and proper defense to all claims set up would be
made by and on behalf of said rolling-mill company; (2) but
in fact said action was not an adversary action, so far as said
Sweet, Huidekoper and the Birmingham iron foundry were
concerned, but was simply carried on by them as a scheme
whereby, under the forms of legal proceedings, they might, by
obtaining a decree for a large aggregate debt which should be
made to appear prior in time to all other claims against said
rolling-mill company, be able to buy in said mills and real
estate, without other payment than of their said decree in
whole or in part, and shut off and bar the claims of all the
*bona fide* creditors of said rolling-mill company, and thus
cheat and defraud the *bona fide* creditors out of their de-
mands; (3) that a large number of *bona fide* creditors answered
in said action, most of whom set up mechanics' liens on said
premises and mills; none of the *bona fide* creditors being aware
of said attempted and contemplated frauds upon their rights,
through the abuse of the process of this court.

NINTH — *The Decree in the Huidekoper Suit:* (1) That said
trial resulted in a decree by the court, which decreed that the
Birmingham iron foundry recover $37,596, and that its de-

13— 37 KAS.

mand was the first lien on the premises; (2) that the said Huidekoper, recover on his thirty-one bonds of said company, and that his demand, together with the said Coldren bonds, so far as aforesaid set up by said Hentig, the Citizens' Bank, and Strong, and the said bond held by the plaintiff, constitute the second lien on said premises and mills; (3) That the said Sweet recover $36,599.40 on the claims and mortgage set up by him as aforesaid, and that his demand was the third lien on said premises and mills; (4) that all the other claims set up by said plaintiff, and the other *bona fide* creditors of said company in said action, were declared to be subordinate to these in various degrees; (5) that under that decree the sum of $37,596, to said Birmingham iron foundry, and the sum of $72,313.80 in said first-mortgage bonds, and the sum of $36,599.40 on said Sweet's demand, were to be first paid, before any of the *bona fide* creditors should share in the proceeds of any sale that might be made, as will more fully appear from said decree on the record of this court; (6) that the said decree ordered the sale of said premises and mills as an entirety, upon the application of said colluding parties.

TENTH—*The Sale of the Rolling-Mills:* (1) That said premises and mills were appraised at the sum of $90,000, and were sold by the sheriff of Shawnee county, under said decree so procured, for the sum of $60,000, to said Sweet, Bassett, and Huidekoper, and said sale was confirmed, and said premises deeded to them by said sheriff without other payment thereof than mere credit on the amount of said decree.

ELEVENTH—*Money in the Hands of the Receiver:* (1) That at the termination of said proceedings a large amount of money, to wit, the sum of $10,000 or more, was in the hands of said receiver, to be paid over by him as the court should direct, and the said Sweet, Huidekoper, and Bassett, for the Birmingham iron foundry, under the said secret agreement, by consent obtained an order of the court for said fund to be paid over to said Birmingham iron foundry, to reimburse it for pretended costs and expenses paid out by it, and said fund was paid over by said receiver, and equally divided betwee

said Sweet, Huidekoper, and Bassett, in pursuance of said secret agreement.

TWELFTH—*Assets of the Mill Company:* (1) That said premises and mills were the sole and entire assets and property of said Rolling-Mill Company, and said company has not since had any property or assets whatever; (2) that said premises and mills were of the actual value of $200,000, and the good-will of the business of said company was well worth $25,000; (3) that the said mills and premises were afterward sold and conveyed by said parties to the Union Pacific Railroad Company, which purchased in good faith, as the plaintiff is informed and believes.

THIRTEENTH—*Discovery by Plaintiff in Error:* (1) that none of said doings or fraudulent acts or schemes or agreements, hereinbefore set forth or alleged, were discovered by said plaintiff until within less than two years next before the filing of this petition; (2) that neither the plaintiff, nor any of the *bona fide* creditors who were parties to said action, received any sum whatever, but their several demands remain still unpaid, both principal and interest.

FOURTEENTH—*Receipts of Sweet:* (1) That Sweet in fact received one-third of the amount due the Birmingham iron foundry, one-third found due said Huidekoper, the whole of the amount found due A. H. Hentig, A. W. Strong, and the Citizens' Bank, on said Coldren's bonds, and one-third of the amount received by the Birmingham iron foundry from said receiver, which amounts, even had said amount due him been just and valid, and said proceedings *bona fide,* as they purported to be, should have been credited on the amount found due the said Sweet, and the benefit thus given to the said rolling-mill company and its creditors; but the said Sweet claims and pretends that the whole amount so found due him is still due, and has issued executions thereon from time to time; (2) that in a certain action now pending in this court by the said plaintiff against said Sweet, to enforce payment upon plaintiff's demands of the individual liability of said Sweet as a stockholder in said rolling-mill company, being action

No. 4952 in this court, said Sweet has pleaded the said amount found due him by said decree, without credit of said sum received by him as a defense, set-off and counter-claim against said plaintiff's just demands; (3) that said rolling-mill company is, and ever since said frauds were perpetrated, and since the organization of said company, has been under the control of said Sweet and said Reuben D. Coldren, and no effort has ever been made by said company, for that reason, to discover said bonds, or compel said Sweet, Derby and Coldren to restore to said company the sum of which it had by them so as aforesaid defrauded.

FIFTEENTH—*Judgment for Plaintiff in Error:* (1) That there was adjudged to be due to said plaintiff on his six several judgments the sum of $1,184.80, and on his note the sum $6,400, and as matured interest on the said bond held by him, the sum of $256.80; (2) that an execution on plaintiff's judgment was duly issued on the 19th day of May, 1881, and duly returned by the sheriff of Shawnee county, wholly unsatisfied for want of any property, real or personal, of said rolling-mill company whereon to levy; all of which fully appears by the records of said court, therein still remaining; (3) that the whole of said plaintiff's demands, with interest, remains unpaid and unsatisfied.

SIXTEENTH—*Sweet's Receipts:* (1) That, after said sale, Sweet, under execution, caused all the machinery and fixtures to be sold; and a portion thereof was sold to third parties for the sum of about $1,000, which the said Sweet received and still retains, and the remainder thereof was bought in by said Sweet, and has since been resold by him at a large profit; (2) that there is now in the hands of said Sweet, as treasurer of said company and as trustee for the creditors of said company, including the plaintiff, derived from the income and proceeds of said mills, and for which he ought to account with said company and its creditors, including the plaintiff, a large sum of money, to wit, the sum of over $100,000, which he unjustly and fraudulently refuses to apply to the payment of said creditors.

SEVENTEENTH—*The Prayer for Relief:* The plaintiff prays that the said Timothy B. Sweet may be required to account: (1) For the actual value of said mills and real estate, and all other property and assets of said company; (2) for all sums received by him for the operation of said mills, or in any wise belonging to or derived from said company; (3) for all amounts that came into the hands of the receiver while in possession of said mills; and that he be required to make good and restore, by money compensation, all things as they would have been had he procured the cancellation of said forty-nine first-mortgage bonds, the defeat of the pretended lien of the Birmingham iron foundry, and refrain from setting up his said answer; and that an account may be taken of the assets of said company, thus derived and restored, and of all of the *bona fide* debts and demands due from said company, and that all such debts may be decreed to be paid of equal right out of said assets; (4) that said Timothy B. Sweet may be ordered to bring and pay into court in the meantime the funds of said company, which have not been paid out upon *bona fide* demands due from said company, without regard to any demand due him, or by him as surety or indorser for said company, the sum received by him of the amount paid over by said receiver to said iron foundry, and the sum received by him on the re-sale of said mills and real estate, or anything pertaining thereto, and for such other and further relief as may be meet and in accordance with law and equity.

These statements, extracted from the body of a long petition, present in chronological order all the material facts alleged, and also the prayer for the relief which the plaintiff in error thinks he is entitled to. The record also contains many exhibits, and among them exhibit "A," a contract between the Shawnee County Bank and the Topeka Rolling-Mill Company, for the purchase and sale of the first mortgage bonds of the company; exhibit "B," a contract between Coldren and Sweet as to money advanced, and liabilities incurred by them, on behalf of the rolling-mill company, and as to the

interest of each in securities given them by the company in the shape of a second mortgage; exhibits "C" and "D," copies of a mechanics' lien filed by the Birmingham iron foundry against the Topeka Rolling-Mill Company for the material furnished in its construction; exhibit "E" is a copy of the agreement made on the 30th day of August, 1876, by the Birmingham iron foundry, Arthur C. Huidekoper, of Mead-ville, Penn., and Timothy B. Sweet, about their respective claims, then being litigated, against the Topeka Rolling-Mill Company, in which they agreed not to resist each other's claims, to press the action of Huidekoper against the company to a speedy trial, and to each have one-third interest in the proceeds of the result of that litigation. In the view (we shall hereafter state it) which we take of this petition, all of these exhibits are not important, and we shall not incumber the opinion with copies of them.

The defendant in error, Timothy B. Sweet, assigned the following causes for demurrer: (1) The plaintiff has no legal capacity to sue; (2) there is a defect of parties plaintiff; (3) there is a defect of parties defendant; (4) several causes of action are improperly joined; (5) the petition does not state facts sufficient to constitute a cause of action.

On the argument of the cause in this court, the most of the assigned causes have been abandoned, or at least they are not referred to in the brief of counsel for the defendant in error, but their contention is: *First,* That the action should not be maintained because the plaintiff in error has been guilty of such negligence and *laches* as to deprive him of the inter-position of the court in this behalf; in other words, his action is barred by the statutes of limitation; *second,* that all matters and things asserted in the petition against Sweet have been adjudicated against the plaintiff in error, as appears by the petition in a suit to which he was a party.

The contention of the defendant in error amounts to the assertion that the petition shows on its face that the supposed cause of action is not only barred, but it also recites a former adjudication against the claim of the plaintiff in error, and

therefore that the petition does not state a cause of action against Sweet. The inquiry that we shall make, then, is: Does the petition state any cause of action against the defendant in error, Sweet? It may be that, under the elastic provisions of the code of civil procedure of this state, and the generic form of action in all cases prescribed by it, any number of preëxisting forms of action may be blended in the civil action of its creation; but in an attempted classification of this action, made either from the general tenor or the specific allegations of the petition, uncertainty results as to whether it was intended to be in the nature of a judgment creditor's bill, or is one of that class of cases in which a court of equity is asked to set aside a judgment on the ground that it was obtained by fraud. The petition contains elements of both, so blended and interwoven that, in the consideration of the questions arising under it, constant recurrence must be had to the rules governing each, in order to determine them. This form of pleading will not be permitted, and in this case, the pleading being attacked by demurrer, the rule is that its language is to be construed against the pleader; and the operation of this rule leads to the conclusion that we shall treat this action as one in the nature of a creditor's bill, seeking to charge Sweet, as a trustee for the creditors of the rolling-mill company, with the proceeds of the sale of the property under the decree of the district court, rendered in the action brought by Huidekoper. We do this because we believe the allegations of the petition amply justify such a conclusion, and for the additional reason that, if any cause of action is stated in this petition, under all the facts recited therein, this is probably the only one that is now available to the plaintiff in error. If it is possible to do so, we shall now endeavor to extract from the body of this petition the exact specific charges made against Sweet, upon which the plaintiff in error, as a creditor of the rolling-mill company, relies as statements of causes of action against him.

The petition charges very many transactions of Sweet, as the agent of the company, with its business affairs, as fraudu-

lent, and among them are: (1) The disposition of a part of the first-mortgage bonds of the company; (2) the procurement of a second mortgage on all the property of the company to secure a pretended indebtedness to him; (3) the retention and use of the daily receipts of the corporation, being a sum vastly in excess of all *bona fide* indebtedness by the company to him; (4) the assignment of Sweet to Coldren of an interest in the second mortgage, and the delivery by Coldren, the president of the company, to Sweet of thirteen of the first-mortgage bonds; (5) the procurement by Sweet from the other officers of the company of an agreement whereby the total receipts of the company were to be turned over and retained by him, and to his exclusive benefit, under the pretense that this was done to reimburse him for money advanced for the use of the company; (6) that Sweet, being the controlling officer of the corporation, and the management of all the litigation of the company being intrusted to him, fraudulently conspired with Huidekoper to place the property of the corporation in the hands of a receiver, the better to carry out his plans to wreck it; (7) that the action brought by Huidekoper against the company, Sweet, and others, was, so far as Huidekoper, the Birmingham iron foundry and Sweet were concerned, a collusive suit, the main object of which was to sell and get control of all the property of the company, and to prevent all other creditors from securing payment of their just demands; (8) that he caused divers persons to file answers in that action setting up claims and demands against the Topeka Rolling-Mill Company in their own names, when in truth and in fact these demands and claims were the property of Sweet, bought by the funds of the company, and used by Sweet for the purpose; (9) that many of the claims and demands set up by Sweet in his answer in that action against the company were false and fictitious, and made with the intent to so largely increase the amount of the first liens on the property of the company that the rest of the creditors of the company would not be able to bid successfully at the sale thereof; (10) that the claims of the Birmingham iron foundry had in fact been

paid, but were used by Huidekoper and Sweet for the purpose of largely increasing the amount of the first lien, and to enable them to control more successfully the sale of the property; (11) that the agreement made by Huidekoper, the Birmingham iron foundry and Sweet, on the 30th day of August, 1876, to press the trial of the Huidekoper suit, and to share in its results, was made to more effectually carry out the understanding between the parties at the time of the commencement of that action; (12) that by reason of this agreement, and protected by it, Sweet was enabled to buy up many claims against the mill company at a large discount, by reason of the fact that those to whom the company was indebted had become tired of the long litigation, and hopeless of any satisfactory results therefrom; and that these claims were set up in an answer by Sweet in the action, and a decree rendered in his favor for them at their face value.

There are many other allegations, but these are among the principal ones. It is true that many of them are stated in the most general terms, and some of them partake more of the nature of legal conclusions than of specific allegations of facts. There is no reason why we should discuss at length all these allegations; for it practically makes no difference how many causes of action may be stated, or how many attempts there have been to state causes of action. The question is: Does the petition state one cause of action against the defendant in error, Timothy B. Sweet? If it does, then we have reached the end of our inquiry.

Having determined that this suit is in the nature of a creditor's bill, seeking to make the defendant in error, Timothy B. Sweet, as an officer and a director of the mill company, and hence by operation of law a trustee for the creditors and stockholders of said mill company, responsible for his management of the business of said company, and that all acts of his as such officer about the business management and litigation resulted to the benefit of the creditors, and not to his individual benefit, and that he must account for all the property, moneys and revenues that came into his hands by virtue of

his employment as vice president, treasurer, and active manager of the concerns of the said mill company, we shall examine the allegations of the petition to find whether it does state a cause of action in this behalf.

But, before proceeding to this, it will be well to state that very many things set up in this petition, and alleged to have occurred prior to the filing of the petition in the case of Huidekoper v. The Rolling-Mill Company, T. B. Sweet, this plaintiff in error, and others, we must regard as finally disposed of by the decree in that case. It must be recollected that the plaintiff in error was a party to that action; that he had a large sum of money involved in its determination; that many of the acts now charged against Sweet as fraudulent had occurred long before the commencement of that suit, and at a time when the plaintiff in error must have had a somewhat active business relation to the company—advancing it money, and indorsing its notes, under such circumstances as would imply an understanding as to what was going on around him; or, at least, would put a prudent man on inquiry, and cause him to follow an ordinary dictate of business prudence—to investigate the condition of affairs. He alleges that the knowledge of many, if not all, of these acts of Sweet which are now charged as fraudulent, did not come to him until after the rendition of the decree in that action; but he ought to have shown some sufficient reason why he did not sooner discover them, or that, with the exercise of reasonable care and diligence, he could not have sooner discovered them; because it has been held, in a great many cases, that reasonable opportunities for discovering frauds practiced under such circumstances, are equivalent to knowledge in a certain class of cases, and to notice in another class of cases. Over seven years had elapsed since the rendition of the decree in that case before this action was commenced. Some of the acts of Sweet, now complained of as being fraudulent as against the plaintiff in error, occurred almost two years before the decree in the Huidekoper case. With the opportunities of the plaintiff in error to acquire knowledge of these transactions, and with a large pecuniary

interest to prompt an investigation, they have been so long waived, if not acquiesced in, that presumption is against the pleader; and to sustain their fraudulent character there must be not only vigorous pleading sustained by strong proof, but there should be a good and sufficient reason given why the discovery was not sooner made. So that we must assert that, so far as the acts of Sweet are concerned prior to the commencement of the action of Huidekoper, the *laches* of the plaintiff in error has been such that we shall regard the decree in that action as a final disposition of all the allegations in the petition respecting them. So far as the record develops, no attempt has been made in the district court to set aside the decree in the case of Huidekoper *v.* Sweet and others for the reason that it was fraudulent, or because it was obtained by fraud. We cannot vacate such a judgment, or disregard it in a collateral proceeding. Proceedings to vacate must originate in the district court. If facts come to the knowledge of the plaintiff in error after the time elapses prescribed by the statute for the commencement of such proceedings, it may be that some equitable remedies can be resorted to. But, be that as it may, we see no way in which we can give the plaintiff in error the benefit of his allegations respecting the numerous transactions of Sweet with the revenues of the company, before the rendition of the decree, so as to aid the attempt in the case to charge him as a trustee of the creditors of the company, except as hereinafter stated.

There is another thing that may as well be said now: We can take no notice of the allegations affecting Huidekoper, Coldren, and Derby, as they are not parties to this action, and their rights were adjudicated and declared in the previous litigation.

Reducing to the most compact forms the material facts bearing upon the inquiry we are making, so as to be easily understood, they are as follows: The Topeka Rolling-Mill Company began business about the 15th day of April, 1874. The defendant in error, Timothy B. Sweet, was its vice president and treasurer—its chief and controlling officer. The mills were

operated by the company until the 31st of December, 1874, under the active management of Sweet, when they were placed in charge and under the control of a receiver, appointed by the Shawnee county district court. On the 12th day of May, 1874, the rolling-mill company made a promissory note to the plaintiff in error for the sum of $5,000, with interest at 12 per cent. per annum from date, payable in eight months, in consideration of so much money advanced by him for the company, and on September 24, 1874, to secure the payment of this note, executed a mortgage on the real estate and mills of said company. On the 22d day of August, 1874, the plaintiff in error, for the accommodation of said company and its surety, T. B. Sweet, indorsed the promissory note of the company for $1,000, due in thirty days, with interest at 12 per cent., which he was compelled to and did pay. On the 11th day of December, 1874, he recovered against said company judgments before a justice of the peace aggregating $852.85 and $31.50 costs. On the 30th day of December, 1874, judgment was recovered against the company in his favor for $171.10. At the time the rolling-mill company went into the hands of a receiver, it owed the plaintiff in error over $7,000. It delivered to him one of its first-mortgage bonds dated January 1st, payable in five years, with interest according to coupons attached. On the 21st day of December, 1874, A. C. Huidekoper commenced an action in the district court of Shawnee county against Sweet and others, alleging the insolvency of the company, the fraudulent possession and use of some of its first-mortgage bonds by Sweet and other of its officers, and praying for the appointment of a receiver and for other relief. On the 31st of December, 1874, a receiver was appointed, who took possession of the property of every kind and description of the company. The plaintiff in error was made a party in this action, and filed an answer setting up his claims against the company as above set forth.

It is alleged that while this suit was pending, and prior to the trial, the defendant in error, Sweet, the plaintiff Huidekoper, and the Birmingham iron foundry, a defendant in the

action, entered into an agreement in writing wherein it was stipulated that they would not contest each other's claims, but have a judgment rendered as speedily as possible, and that each of them should share equally in the benefit of any decree of the court that might be rendered in his favor; and, if the mills and property were sold under a decree, that they should buy them in, and each should have one-third interest therein. On the 21st day of December, 1876, a decree was rendered by the district court of Shawnee county, declaring the amount due the Birmingham iron foundry a first lien on the property of the mill company; that the first-mortgage bonds held by Huidekoper, the plaintiff in error, and others, were the second lien, and the amount found due the defendant in error Sweet the third lien. The property was sold by the sheriff of Shawnee county to Sweet, Huidekoper, and the Birmingham iron foundry, for $60,000, and the proceeds of the sale were credited according to the liens as fixed by the decree, and the mills and property were afterward sold by these parties to the Union Pacific railroad company.

It is alleged that the contract made between Huidekoper, the Birmingham iron foundry, and Sweet, was made with the intent, as far as Sweet was concerned, to cheat, wrong, and defraud the stockholders and creditors of the mill company; that, at the time said contract was made, Sweet, as treasurer, had in his hands a large sum of money belonging to the company; that he used this money to buy up claims against the company at a large discount, and then set them up in his answer against the company at their full face value, instead of giving the company the benefit of the large discount obtained by him; that Sweet had a sum of money, as treasurer of said company, at that time sufficient to pay off all the demands against the rolling-mill company, except those of Huidekoper and the Birmingham iron foundry, and that instead of using it for that purpose, he used the funds of the company to buy up claims in his own name, and for his own individual benefit.

It will be recollected that the agreement between the Birmingham iron foundry, Huidekoper, and Sweet, was made on

the 30th day of August, 1876, and the decree in the Huide-koper action was rendered on the 21st day of December, 1876. The action, at the time of the agreement, had been pending for about two years. The agreement was necessarily a secret one, and it is not strange that the plaintiff in error, or the other creditors of the rolling-mill company, should not be possessed of any knowledge of it. The nature of this agreement is such, that great caution would be observed by the contracting parties to keep it from the knowledge of the other creditors, and it is not surrounded by a chain of circumstances, like other acts of Sweet, that lead to the almost inevitable conclusion that the plaintiff in error knew, or was in such a condition and had such a relation to these parties, as to have such opportunities of knowledge, as to be charged with notice of the existence of such a contract before the determination of the Huidekoper action; while, to all those acts and transactions of Sweet alleged to have taken place before the commencement of the action by Huidekoper, he had such opportunities of knowledge. This agreement was made a comparatively short time before the rendition of the decree, long after the issues were made up, the claims of the creditors presented, and all the active investigation and work of the law suit had been done. We have not the record of the Huidekoper suit before us; but it is alleged in this petition that the claims purchased by Sweet at a large discount with the funds of the company, after he had made the agreement with Huidekoper and the Birmingham iron foundry, were set up in his answer against the company, and that in the rendition of the decree in that case he had the benefit of the full face value, with interest on said claims.

We are not prepared to say that such a contract as that entered into by Sweet, Huidekoper and the Birmingham iron foundry is inherently vicious, nor is it necessary for the purpose of this opinion to vigorously denounce it; for even were it free from all shadow of suspicion or the taint of fraud, if Sweet in a secret manner took advantage of it to buy claims against the company at a large discount with the funds of the

company, then in his hands as its treasurer, and recovered a judgment against the company for the full face value of the claims so purchased, with interest, he violated his trust, and every rule of justice, and every dictate of common honesty. There is a distinct allegation in the petition that the knowledge of the agreement and the subsequent action of Sweet by virtue of it, did not come to the plaintiff in error until long after the rendition of the decree in the Huidekoper action, and within two years before the commencement of this action. It may be that this allegation of itself is sufficient for the purpose of the pleading; but when it is strengthened by the nature of the facts alleged, and the very great probabilities of the situation, it seems but right to give a party who claims to have been greatly injured by reason of gross violations of ordinary trust and confidence an opportunity to prove the facts as charged. We think, with the exception of this comparatively recent and remarkable transaction, the contention of the defendant in error that the plaintiff in error in this action has been guilty of *laches* is sufficiently sustained so as to banish from the consideration of the case all the other statements of causes of action against Sweet. But with respect to this one, it has been so often declared by the courts — the rule is such a familiar one — that the law will not permit the officers of a corporation to so manage its affairs as to result to their private and personal advantage, that it is within the common knowledge of the great body of the people of this country. They must use every honorable means to enhance the general interest of the corporation for the special advantage of the stockholders and creditors. They are universally held to the highest measure of duty and the most scrupulous good faith in their transactions with the business of the corporation. So rigid is the rule — that no one acting in the capacity of a trustee can derive any benefit from the care, control, management or investment of trust funds — that is applied by all courts, without exception, and without any relaxation whatever. There is not to be found in any of the books any better or

1. Officers of corporation; duty to creditors and stockholders.

stronger statement of the law on this question than that contained in the opinion of Chief Justice HORTON, in the case of *Ryan v. L. A. & N. W. Rly. Co.*, 21 Kas. 365.

The questions arising in this case as to the liability of Sweet, as an officer of the mill company, to its stockholders and creditors for the resulting profit of his use of the company funds, are determined by the court in that case. The petition states sufficient in this behalf to constitute a cause of action against Sweet; so that, if, on the trial that is to follow, these averments are supported by evidence, he should be compelled
2. Officer — account to cred-  to account to the creditors of the mill company
itors.  for such part of the proceeds of his receipts from the sale of the property, and the money he received from the receiver, as the facts will justify. We hold that in this case the petition states a cause of action against Sweet, as above suggested, and this is sufficient for the purpose in view. The defendant in error took the risk of the admission of certain recited facts that results from the filing of the demurrer. We have treated these admissions as the averments of the petition justify. What the real facts are will be apparent when the case is tried on full proof.

We express no opinion, further than to say that the petition does state a cause of action, and it is therefore recommended that the ruling of the district court be reversed, and the cause remanded, with instructions to overrule the demurrer.

By the Court: It is so ordered.

HORTON, C. J., and VALENTINE, J., concurring.

JOHNSTON, J., having been of counsel, did not sit.